[No. 1766.]

## RISTINE, RECEIVER OF THE COLORADO MIDLAND RAILROAD COMPANY, v. BLOCKER.

1. EXEMPLARY DAMAGES—PRINCIPAL AND AGENT—RAILROAD COMPANIES—STATUTORY CONSTRUCTION.

Session Laws, 1889, page 64, authorizing exemplary damages in civil actions for damages, where the injury complained of is attended by circumstances of fraud, malice, or insult, or a wanton and reckless disregard of the injured party's rights, does not authorize the assessment of such damages against a principal for the acts of his agent or against a railroad company for the acts of its employé, unless such acts or circumstances authorizing the exemplary damages were committed or caused by the direction of or were affirmed by such principal or employer, and an instruction authorizing a jury to assess exemplary damages against a railroad company for acts of its conductor which were neither directed nor affirmed by the company was reversible error.

2. EXEMPLARY DAMAGES—EVIDENCE.

Where plaintiff boarded a railway train without a ticket, and attempted to ride by virtue of his membership in the Brotherhood of Railway Trainmen, exhibiting what is known as a "traveling card," from such order, which was refused by the conductor on the grounds that the rules of the company did not permit parties to ride on such cards, whereupon plaintiff offered to deposit with the conductor money to be held till he reached his destination when he would get a pass, and if he failed the conductor could retain the fare, which was refused by the conductor, and after the conductor stopped the train to put plaintiff off, plaintiff offered to pay his fare, which the conductor refused to accept on the ground that the rules of the company prohibited him from accepting the fare after the train had been stopped, the facts did not show fraud, malice, or insult, or such disregard of plaintiff's rights on the part of the conductor as would authorize the submission of the question of exemplary damage to the jury in an action against the railroad company.

Judge Thomson expressed no opinion as to the rule of law laid down in the opinion, but concurred on the ground that there was not sufficient evidence of either fraud, malice or insult, or of a wanton disregard of plaintiff's rights to permit the submission of the question to the jury.

*Appeal from the District Court of Arapahoe County.*

BLOCKER came to Divide over the line of a connecting road and attempted to become a passenger on the Colorado Midland when its train reached that station. He took passage and continued to ride until he was put off the train at a switch shortly out of the station. The circumstances of his ejectment were matters of proof by various witnesses. The whole controversy grew out of Blocker's attempt to ride on the train without the payment of his fare. He was an employee of another railroad corporation running out of Chicago, and had in some way been hurt and was in Colorado. We shall not attempt to state *pro* and *con* the contention of the plaintiff and of the road, nor balance the one against the other. The statement will be confined to those facts which are necessary to exhibit the controversy and the general basis to which counsel attempt to apply conflicting rulings upon a much disputed question. Blocker had no ticket. He tried to induce the conductor to permit him to ride on what is called among railway men a traveling card. It purported to have been issued in 1897 by the Brotherhood of Railway Trainmen and certified that he was a member of the Brotherhood in good standing and entitled to fraternal courtesies. His occupation was stated as that of a brakeman. The card bore date in 1896. He stated that he did not have his 1897 card with him, but that they were exactly similar except as to dates. The conductor refused to receive it, or to allow him to ride on it, stating that the rules of the company did not permit the recognition of cards as passes or as permits to ride without the payment of fare. Blocker insists that there was an altercation between him and the conductor about it. When the conductor refused to recognize the card, he insists he produced the money and wanted the conductor to hold it until he got to the Springs when he would get a pass, or if he did not get a pass, the conductor could then take out the fare; this the conductor refused to do. Blocker was noisy and quarrelsome and insistent about it, and the discussion led to quite a controversy. The principal matter about which there is a dispute between Blocker and one or

two of his witnesses and the conductor and others, is as to Blocker's tender of the money, or his offer to pay fare providing the conductor would give a receipt for the money, so that he could get the money back when he got to the Springs, or some other point where his right would be recognized. Blocker insists he tendered the money and offered to pay the fare if the conductor would give him a receipt. This is denied. The matter is in hopeless conflict, though it is probably settled adversely to the company's contention by the verdict. This the counsel for the company concedes, and admits the only question properly predicable on the record is one of law. Possibly this is true, though we do not believe the proof warranted the instruction which is complained of. At all events the conductor assumed that Blocker refused to pay his fare, insisting on his right to ride on the traveling card, and acting thereon the conductor went forward and rang the bell to stop the train. When he came back and told Blocker that this was the place where he got off, Blocker wanted to pay his fare, which the conductor refused to receive, contending that under the rules of the company when he had once stopped the train, he could not afterwards receive the fare. Waiving any further discussion of the testimony, save as to a few suggestions which may appear in the opinion, it need only be stated the case was submitted to the jury on instructions which in the main are uncomplained of save as to one which is made by both counsel and rightly as the majority believe, the pivotal question in the case. When the court instructed the jury, first reciting the respective contentions of the parties and then stating the law controlling the rights of the prospective passenger and the right and the duty of the company, the court charged then substantially, that exemplary or punitive damages were allowable in this state when the injury complained of was attended by circumstances of fraud, malice, or insult, or a wanton and reckless disregard of the injured party's rights and feelings. This rule of law was several times repeated but always in substantially this form and in practically the language of the

statute. The company insists this was error. The statute by which the appellee defends the instruction was passed in February, 1889, and is found in the session laws of that date at page 64. It not having heretofore been construed we will consider it. It consists of one section and is :

" That in all civil actions in which damages shall be assessed by a jury for a wrong done to the person, or to personal or real property, and the injury complained of shall have been attended by circumstances of fraud, malice or insult, or a wanton and reckless disregard of the injured party's· rights and feelings, such jury may, in addition to the actual damages sustained by such party, award him reasonable exemplary damages." The jury rendered a general verdict for the plaintiff for $500. From the judgment the defendant appealed.

Messrs. ROGERS, CUTHBERT & ELLIS and Mr. GEORGE C. PRESTON, for appellant.

Messrs. PATTERSON, RICHARDSON & HAWKINS, for appellee.

BISSELL, P. J.

On this record we are confronted with the inquiry, whether a railroad company can be mulcted in exemplary or punitive damages for the acts of a conductor done while he is engaged in the performance of his duties.

Prior to the enactment of the statute it would not have been debatable. Long ago in elaborate and fully considered opinions, reviewing the whole subject, the supreme court decided that exemplary damages could not be recovered in civil actions sounding in tort where the injury done admitted of a criminal prosecution. The court went no further in the *Hobbs* case than to inhibit the recovery of these damages in such actions. The learned court, however, very gravely suggested it was a doubtful proposition whether they could be recovered in the other large class of actions in tort, even

though the act would not subject the offender to a criminal prosecution. Subsequently the same court, though then differently constituted, extended the doctrine and denied the assessment of punitive damages in any civil action sounding in tort, though the proof might show the injury was committed wantonly and maliciously. We may therefore safely conclude it was the opinion of that tribunal that these damages might not be had in any action of this description. Thereby it became the settled law of Colorado and remained such until the passage of the act. *Murphy v. Hobbs*, 7 Colo. 541; *Railroad Co. v. Yeager*, 11 Colo. 345. It will be observed the passage of this act followed the *Yeager* decision within less than a year and may be taken as probably a professional, and certainly as a legislative, reversal of the rule which these two cases established. Under these circumstances we must accept the statute as expressive of the will of the people, observe it in all cases to which it is applicable, and apply it whenever the occasion arises and we can see the case as made is brought clearly within the terms of the enactment. The question as presented to us by the appellant assumes the form of a clear cut discussion of the question whether a corporation can ever be held liable to respond to such damages in any action sounding in tort where the injury complained of resulted from the acts of its agents. On the other hand the appellee has not only met the appellant on his own ground and discussed this broad inquiry, but he has invoked the statute and insists that it has established another rule and permits the assessment of punitive damages in such actions. In the view which we take of the statute and its proper construction we must necessarily support the statement of our convictions respecting it and its true meaning, and measurably at least discuss what counsel have made a pivotal inquiry. To give both counsel due credit, we may observe they have with great zeal and industry collated all the leading authorities which the books present on both sides of this question. Not omitting the learned and memorable controversy between Professor Greenleaf and Mr. Sedgwick and calling also to

our attention the learned, yet somewhat vituperative and un-judicial discussion to be found in some of the later text books. Recurring to the statute : The appellee naturally lays great stress on the breadth and universality of the language of the act. It begins " in all civil actions," and he argues with great zeal and not without acumen, that no exception can be found in civil actions sounding in tort because the terms of the statute *ex vigore* apply to all civil actions, providing the action or actions be brought to recover for injuries done to the person or to personal or real property and the injuries are attended by the circumstances designated in the statute. Those circumstances, of course, are fraud, malice, or insult, or a wanton and reckless disregard of the injured party's rights and feelings. Counsel might have gone even further and on the word " circumstances " constructed a troublesome argu-ment deducible from the use of that peculiar word. They might have ingenuously contended that it was the legislative intention to prescribe a rule which should permit the assess-ment of such damages wherever fraud could be alleged and established, malice proven, insults shown, or wherever the facts exhibited a wanton and reckless disregard of the injured party's rights and feelings. We confess that the first exam-ination of the statute very much inclined us to accept this contention. Mature reflection and a careful examination of the authorities have led us to believe this construction un-warranted by the terms of the act, and that it would be a construction which followed to its legitimate conclusion would lead to a legal absurdity. This we shall proceed to demonstrate more by the logical process known as the *re-ductio ad absurdum* than by the more usual course of an argu-ment on the facts supported by the citation of authority. To bring about this result we need only state a principle recog-nized by all the authors who have written on the law of torts and recognized by all the decisions wherein the subject has been considered and applied to the class of cases to which we shall refer. To begin with, if we concede that exemplary damages are recoverable in all civil actions sounding in tort

for wrongs done to the person, to personal property or to realty, it further appearing that the circumstances show the elements which the statute makes conditions precedent to their recovery, we shall run up against and be compelled to overthrow a principle which is probably as well settled as any in the law. Ever since 1818, at least in this country, it has been the law that exemplary or punitive damages cannot be awarded except against one who has participated in the offense. *The Amiable Nancy*, 3 Wheat. 346. The rule was reiterated and reaffirmed in the only case to which we shall hereafter refer on the main question under consideration. All the cases discussing the question proceed on the hypothesis that punitive damages are not awarded by way of compensation to the sufferer, but are visited as a punishment on the offender and to serve as a warning to subsequent wrong-doers. Such being the fundamental basis of the doctrine it has always been adjudged and we have been cited to no case, and know of none, wherein a principal has been held liable for exemplary damages because of the wanton and oppressive act or of the malicious intent of his agent. Numerous instances could be easily cited which would instantly suggest to the professional mind the folly of holding that a principal can be thus mulcted for the acts of his agent which were not committed under his express mandate unless he subsequently confirmed and ratified them. If the warehouse man sends his teamster to deliver goods and he recklessly and in wanton disregard of another's rights takes advantage of a situation, runs into his neighbor and smashes his wagon and the neighbor be hurt, the warehouse man doubtless may be compelled to compensate the injured party, but he could never be made liable to punitive damages because the wrong done was recklessly done by his servant, even though he was then engaged in the performance of a duty which the master had laid on him. If the driver of a milk wagon in a reckless attempt for speedy service or because of anger and malice entertained against a rival driver, runs into him and occasions damage to either the driver or the owner's property, the servant being

then engaged in the performance of his duty, the principal is
doubtless liable to make the other whole and compensate the
driver for his personal injuries, but he could not be punished
for the wrong which the servant committed.   If the holder
of a chattel mortgage delivers the instrument to an agent
and tells him to take possession of the property which he
may lawfully do on its maturity, and the agent in the per-
formance of his duty wantonly executes it in reckless dis-
regard of the other's rights and subjects the mortgagor to
insult, even though he may do it with malice, the innocent
mortgagee having given no commands to that end, nor hav-
ing afterwards confirmed the acts of his agent, might be held
liable for any injury done to the mortgagor, but he could not
be mulcted in exemplary damages because of the method of
the agent's performance or the malice by which he was actu-
ated.   The plowman sent by the farmer to plow a field might
by careless and reckless disregard of the adjacent proprietor's
rights, work serious injury to his orchard or to his ditch, yet
no matter what might be the circumstances attending the
performance by the servant of the duty, the master could
only be held to respond for the actual damages sustained, un-
less there was something in the terms of the order, the neces-
sary or implied method of its performance, or the subsequent
adoption of the acts which would charge him with responsi-
bility for the character of the servant's acts.   These illustra-
tions might be multiplied indefinitely and each as fully and
as strongly exhibit a case wherein exemplary damages could
not be assessed.   Notwithstanding this, it would still follow
if we accept the natural language of the statute and the con-
struction insisted on by the appellee that such damages might
be recovered because the suit was a civil action; it was
brought for a wrong done to the person, or for an injury to
personal or real property, and the wrong and the injury were
attended by circumstances showing some one or more of the
conditions precedent nominated in the statute.   All this be-
ing true, it follows the statute is to be interpreted according
to the rules and principles of law applicable to such actions,

and we must therefrom gather and determine whether within the law of tort we can find a principle which controls the question of recovery in certain classes of actions to which the statute can be applied.   Otherwise we should be doing violence not only to the principle of the strict construction of an act but the other co-ordinate and equally controlling one, that a statute is to be construed in the light of the circumstances of its enactment, the wrong it was intended to remedy and the relief which it was intended to afford.   As we look at it, the legislature did not intend to enact into a statute the broad principle that exemplary damages might be recovered in all actions of tort for an injury either to the person or to personal or real property.   It would be gravely doubtful whether an act in this broad form and of this far-reaching scope would not be violative of well settled constitutional principles. This we need not consider, for evidently the legislature had no such purpose and no such object in view when they passed the law.   It provided that under certain circumstances these damages might be assessed.   This was in accord with well settled principles of law which have long been recognized, though according to many decisions, of doubtful expediency and propriety.   In attempting to define and limit the word "all" appearing in the first line of the section, the legislature said these damages could only be recovered where the wrong done was accompanied by certain circumstances.   We may look now to the words used by the legislature in order to determine the circumstances under which such damages are properly assessable.   The words adopted by the legislators are common and familiar ones, having a definite signification in ordinary parlance, and they require no construction to ascertain their force or their meaning.   The words are "fraud, malice, insult, wanton or reckless disregard of the injured party's rights."   It must occur to every thinker and to every lawyer when he considers the phraseology of the act that these words are commonly used only in reference to an individual who commits a wrong, or who is in some way an actor in the wrong, either by direct performance or by what would

make him equally responsible, as where the agent may have been authorized to act under a mandate which either directly or by implication warrants him to act in the manner in which he has performed, or that which is equally available where the principal afterwards confirms what has been done by the representative. If one brings a suit and alleges fraud he must of necessity establish the commission of that thing by the one whom he selects as a defendant. If he would recover damages because of the malicious act of another, it must be the malicious act of him who is sued. It is clearly settled that there can be no wanton and reckless disregard of an injured party's rights except by the one who exhibits it in the commission of the wrong which is the subject-matter of the action. It is for this reason and this only that the courts have always held that the principal is not liable for such damages where the act has been done by his agent without authority directly or impliedly given, or he has not subsequently adopted the act. Such damages are justifiable only in an action against the wrongdoer and not in actions against those who are only consequentially liable because of their relation to the offender. The *Prentice* case, to which we shall refer, fully illustrates this doctrine and cites many cases in support of it which are enough for the purposes of this opinion and which can be referred to by those who are seeking the basis of its support. As was said in a well considered case, *Haines v. Schultz*, approved in *Railroad Company v. Prentice*, " the right to award them rests primarily upon a single ground—wrongful motive. It is the wrongful personal intention to injure that calls forth the penalty." I could multiply authorities and add numerous quotations in support of this principle, but it would in no measure add to the force and strength of the opinion or to the reputation of the author. I should only be guilty of prolixity which is a judicial vice. We, therefore, conclude the legislature did not intend to enact that in all civil actions for wrongs done to the person or to property, exemplary damages might be assessed, but only in those cases where the circumstances show

fraud, malice, insult or a wanton reckless disregard of the injured party's rights or feelings. We also conclude on well settled principles, this can only occur where the suit is brought directly against the wrongdoer who alone can exhibit the intent, and to whom alone can be imputed, and against whom only can be proved the fraud, the malice, the insult or the wantonness which is a condition precedent to the assessment of such damages. The statute, therefore, does not extend to actions brought against a principal for wrongs committed by his servant unless the record exhibits a mandate from which the authority to thus act can be deduced or the principal afterwards confirms what has been done.

Such being our conclusion, we are next to determine whether the statute can be deemed applicable to suits brought against corporations for the acts of its agent. Whether this could or could not have been done under the law prior to the statute is a vexed, disputed, troublesome, indeterminable question. The only thing that the court, to which the question is presented, can do is to accept that line which commends itself to their judgment, and the one which as they conceive is the most strongly supported by the most cogent reasoning of courts whose decisions control, if they do not entirely satisfy, the judgment of the deciding tribunal. As we suggested at the outset, counsel have presented both lines, and no leading or controlling case has been overlooked by either. We confess that we pay little heed to the views of authors, however distinguished, unless they are supported by what we regard as the controlling authorities. Bias, professional training and antecedent experience largely influence their discussion, and it would be unwise for courts to permit themselves to be much influenced by anything other than the particular reasons which they may have been able to cull from the decisions, and possibly in a few instances evolve from their own consideration. It is quite possible the judicial decisions of the various states may be nearly equal in number and in force, and may occupy the same plane of judicial distinc-

tion.   This we do not propose to determine, though the matter is urged as an argument.   Speaking for myself principally, but being entirely authorized thereunto by the entire court, I desire to emphasize the position which I have often taken, that wherever there is a debatable question and there are two lines of authority, and one is supported by the supreme court of the United States and the other condemned by it, we accept the decision of that tribunal.   Adopting the language of that court, the inquiry suggested is, " Can a railroad corporation be charged with punitive or exemplary damages for the illegal, wanton, oppressive conduct of a conductor of one of its trains towards the passenger ? "   It was answered in the negative.   The opinion was supported by a copious citation of the leading authorities.   It was a full and elaborate examination of the whole subject, and in the light of the principles on which the doctrine permitting punitive damages to be assessed is declared, the court adjudged the rule inapplicable in suits against a railroad corporation for the acts of its agents.   Considering that the right rests on the proof of intent, the learned court decided such damages were not recoverable in this sort of an action and under these circumstances against a railroad company.   *Lakeshore, etc., Railway Co. v. Prentice*, 147 U. S. 101.   When we conclude the statute neither directs nor permits the assessment of such damages against a principal for the wrong done by his agent, as we have already demonstrated, it follows the same rule should be applied, the same principle invoked, and the same result reached in an action brought against a railroad company when the basis for the assessment of exemplary damages is to be found only in circumstances showing fraud, malice, insult or reckless disregard of consequences by the agent in which the employer, the railroad company, could not participate.   Admitting always the exception unless there be some order, direction or affirmance which is a prerequisite in the case of a suit against an individual principal, the rule must be the same in both cases.   We therefore conclude for these reasons the court

erred in its instructions to the jury. It is quite true in the *Denver Tramway Co. v. Cloud*, 6 Colo. App. 445, there may be found expressions which would seem to indicate it was the conviction of the court, or at least of the author, that such damages might be recovered in this class of actions. The question, however, was neither presented nor argued as it has been in this case, nor did the court undertake to decide it. What was said was the result more of a cursory suggestion than the result of an elaborate and careful examination which this case has received.

If we had not reached this conclusion respecting the law we are very frank to say that a careful examination of the record and of the testimony would lead us to hold that there was no sufficient evidence of either fraud, malice, or insult or of a wanton disregard of Blocker's rights to permit the submission of the question to the jury. Judge Thomson expresses no opinion on the rule heretofore discussed and laid down, but puts his concurrence on this precise ground. There was a dispute between Blocker and the conductor. It is a matter of considerable doubt under the testimony regardless of the verdict of the jury, whether Blocker tendered his fare prior to the time that the conductor stopped the train or pulled the bell to stop it. Whichever might be true, we do not believe the conductor exhibited any malice or insulted Blocker, or that he acted with a reckless disregard of his rights. If he put him off by reason of the misunderstanding, and if he failed to apprehend that Blocker intended to tender him his fare, it would not necessarily follow punitive damages could be assessed. Blocker was undoubtedly attempting to ride without paying his fare. He was insisting on his right to ride on his membership in the Brotherhood of Railway Trainmen. He was likewise endeavoring to compel the conductor to hold his money as security until he got to the Springs to avoid the payment of $1.60, which if it had been promptly tendered would have undoubtedly been received, a receipt given to him for it, and thereon he could have recovered the money if he was entitled to ride free. There is enough in the case to

lead us to believe this question ought never to have been submitted to the jury. We should have put the decision on this ground alone and refused to discuss the other, but for the fact that the principal inquiry is legitimately suggested by the instructions and is so earnestly pressed on our attention for decision by both counsel that we felt it our duty to determine it, rather than to evade it and place our decision on the latter basis.

For the reasons heretofore expressed, this judgment must be reversed and the case sent back for a new trial.

*Reversed.*